1

2

3

4                       UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   GUADALUPE SALAZAR, et al.,                 Case No. 14-cv-02096-RS

                    Plaintiffs,
8
         v.
9                                              ORDER GRANTING IN PART AND
                                               DENYING IN PART MOTION FOR
10  MCDONALD'S CORP., et al.,                  SUMMARY JUDGMENT

                    Defendants.
11

12

13                              **I. INTRODUCTION**

14        In 2010, defendants McDonald's Corporation and McDonald's USA, LLC ("McDonalds")

15  entered into a franchise agreement with the Bobby O. Haynes Sr. and Carol R. Haynes Family

16  Limited Partnership ("Haynes").[1]  The agreement allocated control of the franchised restaurants

17  along a fine contractual line, with McDonalds setting general operational standards and Haynes in

18  charge of personnel.  Plaintiffs Guadalupe Salazar, Judith Zarate, and Genoveva Lopez are crew

19  members at Haynes-owned McDonalds franchise restaurants in Oakland, California.  In this

20  putative class action, they seek to recover wages allegedly owed to them by Haynes and by

21  McDonalds as franchisor.  McDonalds moves for summary judgment on the grounds it does not

22  jointly employ the named plaintiffs, given it does not retain or exert direct or indirect control over

23  their hiring, firing, wages, or working conditions.

24        Viewing the undisputed evidence in the light most favorable to plaintiffs, McDonalds did

25  not retain or exert direct or indirect control over plaintiffs' hiring, firing, wages, hours, or material

26  _____

27  [1] This partnership is composed of Bobby Haynes, Sr., Carol O. Haynes, and Michele Haynes-
    Watts.  Bobby Haynes, Sr.'s children—Bobby Haynes, Jr., Kimberly Keeton, and Melanie
28  Pomales—work for the partnership.  *See* Haynes Sr. Dep. 15:2–17:5.

United States District Court
Northern District of California

working conditions.  Nor did McDonalds suffer or permit plaintiffs to work, engage in an actual agency relationship, participate in a conspiracy, or aid and abet the alleged wage and hour violations.  Summary judgment for McDonalds therefore is warranted as to those legal theories. The motion for summary judgment also will be granted as to plaintiffs' negligence claim.  The motion must be denied in part, however, because plaintiffs' Labor Code claims may proceed under an ostensible agency theory.[2]

## II. BACKGROUND[3]

McDonalds operates a system of restaurants that prepare, package, and sell a limited menu of value-priced foods.  Like others in the industry, McDonalds adopted a franchise business model to drive the expansion of its products and services from coast to coast.  Steinhilper Decl. ¶¶ 6–7. In 2010, McDonalds and Haynes entered into a franchise agreement permitting Haynes to operate restaurants in accordance with the "McDonald's System."  *Id.* Exs. A, B.  Haynes ultimately acquired eight McDonalds franchises in Oakland and San Leandro, California.  *Id.*

Plaintiffs Guadalupe Salazar, Judith Zarate, and Genoveva Lopez are crew members at McDonalds franchise restaurants operated by Haynes.  On March 12, 2014, on behalf of themselves and a putative class, they brought suit to recover wages McDonalds allegedly failed to pay them in violation of California law.  *See* Dkt. No. 1.  They aver, among other things, managers edit or delete time recorded by the punch-in and punch-out system, require off-the-clock work, and fail to pay meal period, rest period, and mandated overtime compensation.  First Amended Complaint ("FAC") ¶ 150.  Plaintiffs specifically assert various claims under the California Labor Code as well as for negligence, violation of the Private Attorneys General Act ("PAGA"), Labor Code §§ 2698 *et seq.*, and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. &

---

[2] The motion will also be denied as to the derivative claims under the Private Attorneys General Act ("PAGA"), Labor Code §§ 2698 *et seq.*, California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and California Code of Civil Procedure § 1060, none of which were directly addressed by the parties.

[3] The background section provides a general overview of the dispute.  A more detailed analysis of the evidentiary record appears in the discussion below.

United States District Court
Northern District of California

1   Prof. Code §§ 17200 *et seq.*

2   In May 2016, the parties stipulated to dismissal of McDonald's Restaurants of California,

3   Inc.  Dkt. No. 86.  The remaining defendants—McDonald's Corporation and McDonald's USA,

4   LLC—moved for summary judgment on plaintiffs' claims the same day.  Dkt. No. 87.

5   ### III. LEGAL STANDARD

6   Summary judgment is proper "if the pleadings and admissions on file, together with the

7   affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

8   party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary

9   judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v.*

10  *Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party "always bears the initial responsibility

11  of informing the district court of the basis for its motion, and identifying those portions of the

12  pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate

13  the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks

14  omitted).  If it meets this burden, the moving party is then entitled to judgment as a matter of law

15  when the non-moving party fails to make a sufficient showing on an essential element of the case

16  with respect to which he bears the burden of proof at trial. *Id*. at 322–23.

17  The non-moving party "must set forth specific facts showing that there is a genuine issue

18  for trial." Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly

19  supported motion for summary judgment simply by alleging some factual dispute between the

20  parties.  To preclude the entry of summary judgment, the non-moving party must bring forth

21  material facts, *i.e*., "facts that might affect the outcome of the suit under the governing law."

22  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or

23  unnecessary will not be counted." *Id.*  The opposing party "must do more than simply show that

24  there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

25  *Radio*, 475 U.S. 574, 588 (1986).

26  The court must draw all reasonable inferences in favor of the non-moving party, including

27  questions of credibility and of the weight to be accorded particular evidence. *Masson v. New*

28

United States District Court
Northern District of California

*Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

The 2010 amendments to Rule 56 clarified a party may request summary judgment "not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.  Courts may therefore dispose of less than an entire case or claim by granting what Rule 56 now refers to as partial summary judgment.

## IV. DISCUSSION

The California Labor Code imposes the duty to pay minimum wages only upon employers. *Martinez v. Combs*, 49 Cal. 4th 35, 49 (2010).  Accordingly, McDonalds is potentially liable for the asserted wage and hour claims only if it employs the named plaintiffs.[4]  McDonalds asserts it does not employ the Haynes workers because it does not retain or exert direct or indirect control over their hiring, firing, wages, or working conditions.  Plaintiffs insist McDonalds' contractual and economic power, coupled with its regular monitoring of Haynes' compliance with its standards, enables McDonalds to maintain operational control over all relevant workplace conditions.  At bottom, the Franchise Agreement belies the first component of plaintiffs' argument, and the record belies the rest.  McDonalds' operating standards protect brand identity and integrity, but exclude hiring, firing, and other personnel matters.

---

[4] California courts have not resolved the scope of *Martinez*'s application to wage and hour claims arising outside of section 1194 of the Labor Code. *See Johnson v. Serenity Transp., Inc.*, 141 F. Supp. 3d 974, 995–96 (N.D. Cal. 2015).  Courts have applied *Martinez* despite this uncertainty, as will be done here. *See id.* at 996 (collecting cases).

1    Plaintiffs' negligence claim also falls short under California's "new right-exclusive

2   remedy" doctrine.  *See Rojo v. Kliger*, 52 Cal. 3d 65, 79 (1990).  Plaintiffs do raise a triable issue

3   regarding the existence of an ostensible agency relationship, and thus the motion for summary

4   judgment will be granted in part and denied in part.

5    **A. Joint Employer Liability**

6    As a preliminary matter, the parties dispute the authority applicable to the determination of

7   joint employer liability.  They agree on one point—*Martinez v. Combs*, 49 Cal. 4th 35 (2010),

8   supplies the analytical framework.  They part company over the relevance of *Patterson v.*

9   *Domino's Pizza, LLC*, 60 Cal. 4th 474 (2014).

10    In *Martinez*, the California Supreme Court considered whether three seasonal agricultural

11   workers directly employed by a strawberry farmer could hold liable for wage violations two

12   produce merchants through whom the farmer sold strawberries.  49 Cal. 4th at 42.  The court first

13   found the term "employ" has three alternative definitions: "(a) to exercise control over the wages,

14   hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a

15   common law employment relationship."  *Martinez*, 49 Cal. 4th at 64.

16    It then investigated the connections between the farmer, the merchants, and the agricultural

17   workers, and concluded the merchants did not employ the workers under any of these definitions.

18   *Id.* at 68–77.  On the control side of the equation, the court noted the merchants could decide the

19   amount of the advance paid to the farmer, and thereby indirectly control the farmer's ability to pay

20   his workers.  *Id.* at 71–72.  Moreover, "[b]y ceasing to buy strawberries," the merchants could

21   "force[] [the farmer] to lay off workers or to divert their labor to other projects."  *Id.* at 69.  Yet

22   "any substantial purchaser of commodities might force similar choices on a supplier by

23   withdrawing its business," so "[s]uch a business relationship, standing alone, d[id] not transform

24   the purchaser into the employer of the supplier's workforce."  *Id.* at 70.

25    Next, pursuant to the contract, the court noted merchants regularly sent field

26   representatives to communicate with the workers and confirm the crops were of the quality

27   required for purchase, marketing, and sale under the merchants' labels.  *Id.* at 45–46.  The court

28

United States District Court
Northern District of California

1    found these activities did not transform the merchants into the workers' joint employers because

2    there was no evidence the workers "viewed the field representatives as their supervisors or

3    believed they owed their obedience to anyone but [the farmer] and his foremen." *Id.* at 76.  In

4    other words, the farmer alone employed the workers because he "decided which fields to harvest

5    on any given day," *id.* at 43, "hired and fired his employees, trained them when necessary, told

6    them when and where to report to work, when to start, stop and take breaks, provided their tools

7    and equipment, set their wages, paid them, handled their payroll and taxes, and purchased their

8    workers' compensation insurance." *Id.* at 45.

9        While plaintiffs would stop with the decision in *Martinez* and ignore the analysis in

10   *Patterson* as inapposite, a distorted view of operative law would be the result.  In *Patterson*, issued

11   four years after *Martinez*, the California Supreme Court decided the question: "whether a

12   franchisor may be considered an 'employer' who is vicariously liable for torts committed by

13   someone working for the franchisee." 60 Cal. 4th at 492.  The decision is instructive because it

14   elucidates the common law definition of employment in the franchisor context, *id.* at 499, and the

15   common law definition is incorporated as a component of the test articulated in *Martinez*.  Not just

16   that, the opinion focuses on the idiosyncrasies of the franchising relationship, and denigrates

17   reliance on the court's older decisions, "none of which concerned franchising." *Id.* at 493.

18       The plaintiff in *Patterson* was harassed by her supervisor while working for a Domino's

19   franchisee, and argued the franchisor was vicariously liable for the workplace harassment. *Id.* at

20   477.  The court concluded the "imposition and enforcement of a uniform marketing and

21   operational plan cannot *automatically* saddle the franchisor with responsibility for employees of

22   the franchisee." *Id.*  Instead, the franchisor must "exhibit the traditionally understood

23   characteristics of an 'employer' or 'principal;' i.e., it has retained or assumed a general right of

24   control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-

25   to-day aspects of the workplace behavior of the franchisee's employees." *Id.*  Thus, "the mere fact

26   that the franchisor has reserved the right to require or suggest uniform workplace standards

27   intended to protect its brand, and the quality of customer service, at its franchised locations is not,

28

standing alone, sufficient to impose 'employer' or 'principal' liability on the franchisor for statutory or common law violations by one of the franchisee's employees toward another." *Id.* at 498 n.21.

Applying this standard, the court observed the franchise agreement permitted use of the "Domino's System" and required compliance with a separate Managers Reference Guide, *id.* at 484, which prescribed detailed standards and procedures, *see id.* at 478. "These standards were vigorously enforced through representatives of the franchisor who inspected franchised stores." *Id.* at 478. Stores were rated on "customer orders, food preparation, product packaging, employee uniforms, and store cleanliness." *Id.* at 486. Domino's also provided "an orientation program for new employees on the store's computer system, i.e., the 'PULSE' system," *id.* at 482, which was a "comprehensive sales and accounting program that Domino's required franchisees to buy and use in their stores," *id.* at 482 n.2. As a practical matter, the franchisee felt he always had to say "yes" to Domino's representatives, *id.* at 485, as franchisees who did not follow the suggestions were "out of business very quickly," *id.* at 506.

On the other hand, the contract "described the parties as 'independent contractors,' regardless of any training or support on Domino's part." *Id.* at 484. It also released Domino's from liability for any damages to any person or property arising directly or indirectly out of the operation of the franchise. *Id.* The contract further stated the parties had no principal-agent relationship, and Domino's disclaimed any relationship with the franchisee's employees. *Id.* On this record, the court found Domino's "had no right or duty to control employment or personnel matters for [the franchisee]." *Id.* at 501.

The "parties' characterization of their relationship in the franchise contract is not dispositive," however, so the court proceeded to examine the record. *Id.* at 501. Perhaps most important, there was "essentially uncontradicted evidence that the *franchisee* made day-to-day decisions involving the hiring, supervision, and disciplining of his employees." *Id.* at 478. The record also revealed the franchisee "imposed discipline consistent with his *own* personnel policies, declined to follow the ad hoc advice of the franchisor's representative[s], and neither expected nor

1  sustained any sanction for doing so." *Id.* at 479 (emphasis added).  As "Domino's lacked the

2  general control of an 'employer' or 'principal' over relevant day-to-day aspects of the employment

3  and workplace behavior of the [franchisee's] employees," *id.* at 499, the court concluded there was

4  "no basis on which to find a triable issue of fact that an employment or agency relationship

5  existed," *id.* at 503.

6        Plaintiffs correctly observe *Patterson* involved a claim under California's Fair

7  Employment and Housing Act.  The franchisor's liability, however, depended on whether it was

8  an "employer" of the franchisee's employees, which was examined using "traditional common law

9  principles of agency and respondeat superior."  *Id.* at 499.  Given these principles supply the

10  "proper analytical framework . . . for franchising generally," it is appropriate to look to

11  *Patterson*'s analysis for guidance.  *Id.*

12        **B. Joint Employer Status Under *Martinez* Prong 1**

13        Under prong one of the *Martinez* three prong definition, an entity employs a worker if it

14  "directly or indirectly, or through an agent or any other person . . . exercises control over the[ir]

15  wages, hours, or working conditions."[5]  IWC Order § 2; *Martinez*, 49 Cal. 4th at 64.  The

16  strawberry farmer in *Martinez* supplies helpful guidance for applying this standard.  Under the

17  terms of his contract, he alone employed his workers, and in practice, he "decided which fields to

18  harvest on any given day," *id.* at 43, "hired and fired his employees, trained them when necessary,

19  told them when and where to report to work, when to start, stop and take breaks, provided their

20

21     [5] In *Ochoa v. McDonald's Corporation*, 133 F. Supp. 3d 1228 (2015)—a case virtually identical to
this one—the court observed "this language is potentially quite broad in scope," but found

22  "California courts have circumscribed it by denying employer liability for entities that may be able
to influence the treatment of employees but lack the authority to *directly* control their wages, hours

23  or conditions."  *Id.* at 1233 (emphasis added).  Plaintiffs insist *Ochoa* erred by limiting
"employer" to entities with "authority to directly control the [workers'] wages, hour or conditions"

24  and in finding it "dispositive" that the franchisee made the final hiring, firing, wage, and staffing
decisions, without regard to the franchisor's involvement and indirect control.  Opp'n at 3:19 n.4.

25  In any event, the court in *Ochoa* proceeded to examine the aspects of indirect control highlighted
by the plaintiffs.  *See, e.g.*, *Ochoa*, 133 F. Supp. 3d at 1236 ("[I]t is clear that McDonald's has the

26  ability to exert considerable pressure on its franchisees.").  It simply found them insufficient in
light of the examples provided in *Martinez* and *Patterson*.  *See id.* (rejecting arguments based on

27  "McDonald's strength as a franchisor").

28

United States District Court
Northern District of California

tools and equipment, set their wages, paid them, handled their payroll and taxes, and purchased

their workers' compensation insurance," *id.* at 45.

Plaintiffs set forth a great deal of evidence in an attempt to distinguish this case from *Martinez*. They argue principally that McDonalds retains a contractual right of control, and *indirectly* controls working conditions by articulating optional standards and subsequently conducting graded visits. At the end of the day, however, several crucial facts cannot reasonably be disputed: (1) McDonalds did not directly or indirectly retain the right to control employment or personnel matters at the Haynes restaurants; (2) McDonalds is not involved in hiring Haynes employees; (3) McDonalds is not involved in disciplining Haynes employees; (4) McDonalds is not involved in setting work schedules or dispensing specific work assignments; (5) McDonalds is not involved in determining when to provide rest breaks or meal periods; (6) McDonalds does not set the rates of pay or dispense pay to Haynes employees; (7) restaurant managers oversee Haynes employee training; (8) Haynes runs its own orientations; (9) Haynes is free to reject (and did reject) business advice it receives from McDonalds consultants; (10) plaintiffs went to Haynes with questions and concerns about their jobs; and (11) Haynes, not McDonalds, purchased workers' compensation insurance. In light of these facts, as discussed in detail below, and the guidance provided in *Martinez*, McDonalds did not exercise direct or indirect control over plaintiffs' wages, hours, or working conditions.

### 1. Franchise Agreement

The parties mutually agree Haynes is an "independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business." Franchise Agreement ("FA") § 16. The contract also states "[Haynes] and McDonald's are not and do not intend to be partners, associates, or *joint employers* in any way and McDonald's shall not be construed to be jointly liable for any acts or omissions of [Haynes] under any circumstances." *Id.* (emphasis added). It further provides Haynes "shall have no authority, express or implied, to act as agent of McDonald's." *Id.* Finally, the only contractual provisions directed at labor issues require franchisees to "employ adequate personnel," FA § 12(g), purchase

workers' compensation insurance, *id.* §§ 17(a), (c), and to cause their employees "to (i) wear uniforms of such color, design, and other specifications as McDonald's may designate from time to time; (ii) present a neat and clean appearance; and (iii) render competent and courteous service to Restaurant customers," *id.* § 12(h).  Applying *Martinez*, mindful of *Patterson*'s gloss, such policies are not problematic.

Plaintiffs' contention that the agreement does not preclude the franchisor's direct involvement in personnel decisions is inconsistent with the undisputed facts.  The agreement incorporates explicitly the McDonalds business manuals, and thus the Operations and Training ("O&T") manual.  FA § 4.  That manual provides that policies related to personnel practices, crew management and scheduling, and training are optional for franchisees.  The "People" section states: "Franchisees are independent employers who make their own decisions and policies regarding employment-related matters pertaining to their employees.  Franchisees may choose to use part, all, or none of the contents in these materials that will be helpful to them in operating their own McDonald's restaurants."  Steinhilper Decl. Ex. C.  The "Training" section provides: "Franchisees are independent employers and are solely responsible for hiring, assigning roles and responsibilities to, training, and advancing their employees.  Franchisees should establish their own policies and may choose the information from this chapter that will be helpful to them in operating their business."  *Id.* Ex. D.  The "Crew Management and Scheduling" chapter provides: "Subsidiaries, affiliates, and licensees establish their own human resources policies and may choose the information from this chapter that will be helpful to them in operating their businesses."  *Id.* Ex. E.  In short, the franchise agreement is clunkier than in *Martinez*, as franchisees must "adopt and use" a manual that provides them with complete autonomy over personnel decisions.  Nonetheless, it strongly evinces Haynes has complete discretion over "the selection, hiring, firing, supervision, assignment, direction, setting of wages, hours, and working conditions of [its] employees,"[6] *Martinez*, 49 Cal. 4th at 77, and plaintiffs offer no facts to the

_____

[6] Notably, a related manual, the ROIP People Self-Assessment Guide, states "[o]wner/operators are responsible for all employment related matters in their restaurant(s) and exercise complete

CASE NO. 14-cv-02096-RS

United States District Court
Northern District of California

1   contrary.

2       Next, plaintiffs submit the agreement establishes a generic right to control the terms and

3   conditions of employment through compliance with the "McDonald's System."  The contract

4   requires "strict adherence to McDonald's standards and policies as they exist now and as they may

5   be from time to time modified."  FA § 1(d).  In plaintiffs' eyes, this statement means McDonalds

6   can modify its manuals to revoke the autonomy of the franchisees, and in that sense it retains the

7   right to control the material working conditions of their employees.

8       This thread is too thin to establish liability as a joint employer.  In *Martinez*, the court

9   assumed without deciding "the *right* to exercise control over the manner in which work is

10  performed is sufficient to prove the existence of an employment relationship."  *Id.* at 76.  It then

11  found the argument unavailing because the contract did not explicitly give the merchants the right

12  to direct the farmer's employees, nor did anyone believe the merchants had any such right.  *Id.* at

13  76–77 (distinguishing *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341

14  (1989)).  The same is true here—even if McDonalds retains the right to update its business

15  manuals, the agreement still lacks any contractual right authorizing McDonalds to direct the

16  Haynes employees in their work.[7]  It also is worth noting *Patterson* insists analysis of the

17  franchise relationship must respect "contemporary realities," and periodic updates to manuals

18  provide a continuous means of "protecting the trademarked brand."  60 Cal. 4th at 490.  Thus, "the

19  mere fact that the franchisor has *reserved* the right to require or suggest uniform workplace

20  standards . . . is not, standing alone, sufficient to impose 'employer' or 'principal' liability on the

21  franchisor."[8]  *Id.* at 498 n.21 (emphasis added).

22      Finally, plaintiffs argue more specifically the agreement requires Haynes to employ

23

24  control over the work, working conditions, and terms and conditions of employment for
    employees in their restaurants."  Steinhilper Decl. Ex. F.

25  [7] As detailed below, the factual record also belies the direct or indirect exercise of any such right.
26  *Id.* at 71–72.

27  [8] Plaintiffs' contrary authority is not from California or pre-dates both *Martinez* and *Patterson*.

28

United States District Court
Northern District of California

"adequate personnel," and states correspondingly it is a material breach to spurn any standard

prescribed by the McDonalds System.  This vague operational obligation clearly is directed

toward protecting "the quality of customer service," *Patterson*, 60 Cal. 4th at 479, and in any

event does not demonstrate the retention of control over day-to-day personnel matters.  That

McDonalds theoretically would have to terminate the agreement to get its way only emphasizes

that fact.[9]  Further, in light of Haynes' autonomy, McDonalds disclaims inadequate staffing would

even constitute a material breach.  The record supports that assertion: Haynes staffed its

restaurants inadequately in practice, yet neither expected nor sustained any sanction for doing so.

Haynes, Sr. Dep. Ex. 3; Haynes, Jr. Dep. Ex. 33; Haynes, Sr. Dep. 203:16–205:22.  At its core, the

franchise agreement does not afford McDonalds direct or indirect control over Haynes personnel.

### 2. Wages

The record reflects Michele Haynes-Watts, with input from other Haynes employees, sets

the wages for all crew members at Haynes operated restaurants.  Haynes-Watts Dep. 224:21–

225:10.  Haynes also uses its own payroll provider, Haynes Jr. Dep. 255:4–22, to whom Haynes

employees transmit time record data for processing, Haynes-Watts Dep. 61:3–22.  The payroll

provider formatted the checks and wage statements that go to Haynes employees, Haynes-Watts

Dep. 191:15–17, and only Haynes is listed as the employer on paystubs, Haynes-Watts Dep. Ex.

73–74, which are signed by Bobby Haynes, Senior, *id.*  Much like the franchisee in *Patterson*,

Haynes further maintains its own bank accounts, *see* Haynes Jr. Dep. 264:9–11; Haynes-Watts

Dep. 225:23–226:5, and McDonalds lacks access to or control of Haynes' payroll system and its

bank accounts, Haynes Jr. Dep. 262:24–264:11.  Lastly, plaintiffs testified uniformly they spoke

only with Haynes managers about their wages.  Lopez Dep. 66:1–67:5; Salazar Dep. 106:4–

107:15; Zarate Dep. 60:6–14.  The inference fairly supported by this evidence is that McDonalds

does not exercise control over this domain.  *See also* Haynes-Watts Dep. 225:8–10.

---

[9] Termination is also akin to the merchants' ability to withdraw their business, as detailed in *Martinez*, 49 Cal. 4th at 69–70, which in practice is not sufficient to constitute indirect control, even if it does permit influence.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs assert McDonalds exercises *indirect* control over Haynes employees'

2   compensation by imposing reinvestment and financial viability standards, and dictating non-labor

3   costs, thereby limiting the amount Haynes can pay while remaining profitable.  As detailed above,

4   this precise type of argument was found wanting in *Martinez*.  49 Cal. 4th at 71 (rejecting

5   argument that "contractual relationship" permitted merchants to exert "indirect control" over

6   employees' wages).

7            *3. Hiring, Firing, and Discipline*

8       The general managers make the hiring decisions in response to applications for

9   employment, Haynes-Watts Dep. 220:21–221:4; Haynes Jr. Dep. 260:17–19, and Haynes

10  employees alone conduct hiring interviews, Haynes-Watts Dep. 221:5–12; Keeton Decl. ¶ 4.  The

11  general managers also conduct employee performance evaluations, Haynes-Watts Dep. 221:25–

12  226:12, and are responsible for imposing employee discipline when warranted, Haynes-Watts

13  Dep. 222:13–223:9.

14      Zarate testified she was interviewed and hired by a Haynes restaurant supervisor.  Zarate

15  Dep. 24:2–9.  Likewise, Salazar attests she was interviewed by Michele Haynes, and then

16  subsequently hired.  Salazar Dep. 35:2–36:5.  Lopez was interviewed by Bobby Haynes Sr. at the

17  San Leandro office, and later was told by her restaurant manager she got the job.  Lopez Dep.

18  39:5–43:12.  As to discipline, both Salazar and Zarate recalled incidents in which they received

19  warnings from their restaurant managers, *see* Salazar Dep. 201:1–24; Zarate Dep. 95:17–98:22,

20  and Salazar sometimes discussed written warnings she received with her manager, Zarate Dep.

21  95:17–98:22.  This record does not reflect McDonald's exercises control over hiring or employee

22  discipline.

23      McDonalds' business consultants evaluate Haynes on its use of an online tool known as

24  "Hiring to Win."  Haynes Sr. Dep. 145:17–146:1.  Through that website, individuals can apply for

25  employment at a Haynes restaurant, even though the screening questions were written by

26  McDonalds, not Haynes.  Haynes-Watts Dep. 172:2–12.  The program separates applicants into

27  three categories—green, yellow, or red.  Virtually all of the McDonalds restaurants in the region

28

1   utilize Hiring to Win.  Gehret II Dep. Ex. 29. at HAYNES_260332.  Given that fact, plaintiffs

2   argue a jury could find the program is mandatory, and that McDonalds thereby "influences" hiring

3   decisions at the Haynes restaurants.

4          The record belies that assertion.  The Hiring to Win tool indisputably is an optional

5   resource made available to franchisees.  *See* Haynes-Watts Dep. 171:15–20, 172:13–16; Haynes

6   Jr. Dep. 261:14–17.  Haynes elects to use it, but receives only half of its applications through this

7   method.  *Id.* 172:13–16.  Additionally, Haynes does not send the applications to its managers with

8   the online tool's assessments, *id.* 173:5–22, and does not use the interview guides, *id.* 174:10–15.

9   The record reflects interviews and hiring decisions are made by restaurant managers.  Taken

10  together, these facts do not evince McDonalds exercises any actual control over employee hiring.

11                *4. Software*

12         McDonalds requires Haynes to use a Point of Sale ("POS") system to process and track

13  transactions, Lewis Dep. 44:7–11, and a proprietary program called the In Store Processor ("ISP")

14  to open and close that system each day, *id.* 60:7–61:18, 63:18–22.  The ISP has a number of

15  optional features that Haynes may elect to use, including software related to timekeeping,

16  discipline, scheduling, payroll, and restaurant inventory.  *Id.* 63:9–22.  *See also* Haynes Jr. Dep.

17  257:9–259:9.  McDonalds also makes available a number of additional packages Haynes can

18  utilize to help run its business, including the e*Restaurant package, the Dynamic Shift Positioning

19  Tool ("DSPT"), and the Staffing, Scheduling & Positioning ("SSP") tool.

20         While there is no dispute McDonalds does not require use of these programs for

21  scheduling, timekeeping, or wage and hour functions, plaintiffs submit "no economically rational

22  franchisee" would decline such usage given the costs and risks of alternative options.  Opp'n at

23  14:4–7.  McDonalds audits restaurants with these programs in mind, *see* Taylor Decl. Ex. A, and

24  Haynes accordingly adopted many of these features.  *See, e.g.*, Haynes-Watts Dep. 50:18–51:6.

25  What is more, alleged programming errors in this optional software are driving the wage and hour

26

27

28

United States District Court
Northern District of California

violations.[10]  Given McDonalds pressures franchisees to adopt the flawed software, and Haynes

relied on it to record employee time, Haynes-Watts Dep. 50:18–20, 55:13–15, 58:6–59:13, 60:5–

14, plaintiffs submit McDonalds exercises control over their material working conditions.

California authority suggests the provision of such software does not convert a franchisor

into a joint employer, even when the programs allegedly give rise to putative wage and hour

violations.  In *Aleksick v. 7-Eleven, Inc.*, 205 Cal. App. 4th 1176 (2012), the California Court of

Appeal applied *Martinez* in a situation where a franchisor, 7-Eleven, contractually required its

franchisee to use 7-Eleven's payroll service.  *See id.* at 1190–91.  Pursuant to that system,

franchisee employees used an In Store Processor to record their time.  *Id.* at 1181.  The franchisee

then submitted to 7-Eleven the hourly rate and number of hours worked by its employees each

week.  *Id.* at 1190.  At that point, 7-Eleven applied its "payroll method," akin to the software

glitches here, which converted the time worked to a total number of minutes, but truncated the

number beyond the hundredth decimal place.  *Id.* at 1181.  Plaintiffs argued this truncation method

deprived them of the mandated minimum wage, and established 7-Eleven's control over their

wages and hours to support the imposition of vicarious liability.  The court concluded to the

contrary as to all three definitions of employment described in *Martinez*, given "7-Eleven

exercised no control over [the franchisee's] employees, including their hiring or firing, rate of pay,

work hours and conditions."  *Id.* at 1190.  *See also Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th

1419 (2010) (declining to find payroll company is a joint employer liable for allegedly failing to

pay overtime).  It is likewise worth noting that *Patterson* involved a "comprehensive sales and

---

[10] The ISP scheduling application establishes shift lengths and crew schedules based on projected customer transactions and calculations of how many crew will be needed throughout the day.  *See* Lewis I Dep. 206:2–9; Lewis II Dep. 100:14–101:13, 266:17–267:2.  Similarly, the DPST determines where crew members should be positioned throughout their shifts and what duties they should perform.  Stein Dep. 194:7–23, 197:19–198:6.  Importantly, the labor law settings identify which precise shifts require meal periods and rest breaks.  According to plaintiffs, however, the scheduling function does not schedule any rest breaks, any required second meal periods, and throws off the scheduling of subsequent meal periods when the first one is incorrectly set.  Plaintiffs also insist the ISP does not flag when individuals are owed premium pay for missed and late breaks, and incorrectly calculates overtime by assigning all hours for overnight shifts to a single day.

accounting program that Domino's required franchisees to buy and use in their stores." 60 Cal. 4th at 482 n.2. Yet that mandated program did not establish Domino's control over wages, hours, or working conditions. Here, while the record reflects McDonalds pressures franchisees to use the optional scheduling and timekeeping functions, that alone does not establish the requisite control in light of the above authority.

### 5. Training

New crew members receive an orientation packet compiled by Haynes, though some of its content may have originated with McDonalds. Haynes Sr. Dep. 146:11–18. A Haynes employee then conducts an orientation at the San Leandro office. Haynes-Watts Dep. 22:4–23:11. Plaintiffs' actual experiences onboarding with Haynes confirm this framework. *See, e.g.*, Salazar Dep. 55:9–57:17; Lopez Dep. 84:7–10.

Once on the job, new employees are trained by managers and crew members. *See, e.g.*, Zarate Dep. 83:19–22; Haynes-Watts Dep. 21:9–10. For instance, Salazar and Lopez testified their managers arranged for them to watch training videos. Salazar Dep. 66:10–16; 169:12–170:23; Lopez Dep. 81:4–86:12. Lopez further explained her manager took her to the kitchen to show her how everything worked. Lopez Dep. 83:1–4. She started with french fries, hashbrowns, and meat, then moved to food preparation, which involved yogurt, salad, cheese, and various breakfast ingredients. Lopez Dep. 83:9–86:17. Plaintiffs also testified managers and employees trained them on how to record their hours, told them about meal and rest break policies, and showed them how to prepare new products. Lopez Dep. 102:21–25, 192:24–193:23; Salazar Dep. 171:11–18; Zarate Dep. 82:17–83:9. This record reflects training was handled by Haynes employees.

Plaintiffs assert McDonalds dictates the contents of the orientation packet and videos, and through its consultants, directly trains managers and other crew members. The latter topic is addressed below, and the former is not problematic. In *Martinez*, the merchants' representatives explained to the farmer and his foremen how packing was to be done, and the farmer and his team then passed that training down to the agricultural workers. 49 Cal. 4th at 76. This basic

1    orientation did not cause the court pause, nor does it raise a triable issue here.  *See Ochoa*, 133 F.

2    Supp. 3d at 1237 (noting these aspects are not the type required to find McDonalds exercised

3    control over wages, hours or working conditions).

4            Plaintiffs also point out McDonalds requires Haynes managers to undergo training on

5    wage and hour issues, Taylor Decl. Ex. B, which likely filters down to restaurant employees

6    notwithstanding Haynes' discretion over personnel matters.  Once again, such training, though an

7    influence, does not reflect indirect control over plaintiffs' working conditions because McDonalds

8    has no right or ability to participate in the decision-making process after the training is completed.

9                            *6. Supervision and Working Environment*

10           The general managers determine the employees' work schedules based on experience,

11   store hours, and expected sales volume.  Haynes Jr. Dep. 259:11–260:14.  They also decide when

12   to permit employees to take their meal and rest breaks.  Haynes-Watts Dep. at 223:10–224:7.  The

13   managers further determine the specific work assignments that are given to the employees in each

14   store, Haynes Jr. Dep. at 261:21–262:5, and only the managers (either restaurant or swing) may

15   edit a crew member's time records.  *Id.* at 262:13–18.  Uniform requirements, Haynes-Watts Dep.

16   225:11–20, employee evaluations, Haynes-Watts Dep. 221:25–226:12, and discipline are also

17   handled by the managers, Haynes-Watts Dep. 222:13–223:9.  Plaintiffs confirmed managers set

18   work hours, Zarate Dep. 55:8–11; Salazar Dep. 95:18–21; Lopez Dep. 71:20–25, assign them

19   duties, Lopez Dep. 54:7–12; Salazar Dep. 98:9–12; Zarate Dep. 58:13–16, and tell them when

20   they are needed, Zarate Dep. 75:3–8; Salazar Dep. 147:17–21; Lopez Dep. 77:2–16.  Requests for

21   accommodations, *see, e.g.*, Lopez 74:14–17, and questions about the job are also addressed only to

22   Haynes employees, *see, e.g.*, Salazar Dep. 188:19–23; Zarate Dep. 125:5–17.  This record reflects

23   Haynes, not McDonalds, is responsible for employee supervision.

24           Plaintiffs point out McDonalds provides franchisees with optional resources like

25   workplace positioning guides, then grades them on their uptake, allowing McDonalds to exercise

26   "effective" control over restaurant operations.  They also note every restaurant must be managed

27   by a graduate of McDonalds-run Hamburger University, Dubois Dep. 230:9–13, and argue

28

United States District Court
Northern District of California

McDonalds forced Haynes to designate "department managers" as part of the Restaurant

Department Manager ("RDM") initiative.  The undisputed evidence, however, reflects RDM was

optional, and Haynes in fact ultimately spurned it.  Haynes Sr. Dep. 93:6–15, 106:4–7; Haynes Jr.

Dep. 148:10–150:8; Haynes-Watts Dep. 109:3–5.  Further, the adoption and monitoring of

customer service metrics does not give rise to a triable issue of fact.  *See Martinez*, 49 Cal. 4th at

76 (merchant set packing standard, taught it to workers through representatives, and enforced

standard, but did not thereby "supervise[] or exercise[] control over [farmer's] employees");

*Patterson*,  60 Cal. 4th at 498 n.21 (adoption and enforcement of "uniform workplace standards

intended to protect [franchisor's] brand" insufficient to support vicarious liability).

### 7. Consultants

McDonalds is contractually obligated to consult with Haynes in connection with the

operation of the restaurants.  FA § 3.  These consultants provide marketing and general business

advice, and ensure compliance with McDonalds' contractual standards.  McDonalds readily

admits consultants also evaluate franchisees against its National Franchising Standards ("NFS"), a

set of metrics McDonalds uses to make decisions on whether to continue or expand a franchising

relationship.  The NFS provide they "are internal guidelines which McDonald's may apply,

modify or eliminate as it deems appropriate.  They are not intended and do not create or modify

any contract rights or obligations.  As always, those rights and obligations are determined only by

McDonald's signed, written Franchise Agreements."  McRee Decl. Ex. EE.  In other words, "[t]he

Standards are not intended to, and do not necessarily address whether an Owner/Operator is in

compliance with the Franchise Agreement," *id.*, though eligibility for "growth and rewrite"—the

renewal of the relationship—appears to require compliance with the franchising standards, Haynes

Sr. Dep. 64:17–21.

Undoubtedly, McDonalds can exert significant economic pressure on Haynes through

these reviews, *see* Slater-Carter Decl. ¶ 9, but the consultants themselves are limited to providing

advice about the operation of the restaurants.  That is, consultants do not "have any authority in

[the Haynes] business whatsoever."  Haynes Jr. Dep. 252:11–16.  They cannot make staffing

decisions, *id.* 251:25–252:16, access crew schedules, *id.* 254:2–4, or obtain payroll reports, *id.* 254:18–255:2.  Haynes can reject any business advice it receives from McDonalds consultants, *id.* 250:3–23, and has in fact rejected McDonalds' advice in the past, *id.* 250:25–251:24.

Plaintiffs submit the consultants' instructions amount to the exercise of control, but that proposition was rejected squarely both in *Martinez* and *Patterson*.  In *Martinez*, field representatives showed workers how to pack, checked "packed containers as workers brought them from the field," and "sp[oke] directly to the workers, pointing out mistakes in packing."  49 Cal. 4th  at 76.  There, as here, this conduct did not support the imposition of vicarious liability because the workers did not "view[] the field representatives as their supervisors or believe[] they owed their obedience to anyone but [the farmer] and his foremen."  *Id.* at 76.  In *Patterson*, Domino's representatives "recommended changes in pricing and staffing levels," "trained franchisees when their doors first opened or when a new product was launched," and "coach[ed] franchisees and employees" on a host of different topics.  60 Cal. 4th at 486.  The court found the "enforcement of a uniform marketing and operational plan" was central to modern franchising, and concluded such oversight did not subject a franchisor to vicarious liability in the absence of control over "relevant day-to-day aspects of the workplace behavior of the franchisee's employees."  *Id.* at 478.  Lastly, once again, *Martinez* said the ability to impose economic pressure, standing alone, does not make the party who possesses that ability a joint employer. *Martinez*, 49 Cal. 4th at 69–70 (finding "[s]uch a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's workforce").  That McDonalds can exert significant economic pressure is not enough to subject it to vicarious liability.

### 8. Property Ownership

McDonalds owns the property it leases to Haynes for three of its restaurants, and is the primary leaseholder for the other properties, which are subleased to Haynes.  Gordon Decl. ¶ 11.  The Franchise Agreement also affords McDonalds the right to enter and take possession of the premises in the event of a material breach of the contract so McDonalds can protect its goodwill.  FA § 20(a).  Plaintiffs insist this arrangement allows McDonalds to exert control over the

premises, and thus indirectly to exercise control over the employees' working conditions.  In

*Martinez*, however, the farmer likewise leased two sites from one of the produce merchants, who

similarly retained a contractual "right to enter the leased property."  49 Cal. 4th at 69.  That facet

was not enough to persuade the court the merchants could exercise the requisite control.  So too in

the present case.

In sum, the evidence in the record does not raise a triable issue of fact as to whether

McDonalds retained or exercised direct or indirect control over plaintiffs' wages, hours, or

working conditions.  Contractually, McDonalds did not retain the right to control personnel

matters at the Haynes restaurants.  In practice, McDonalds exerts pressure, like the merchants in

*Martinez*, because it theoretically can withdraw its business, but it cannot directly or indirectly set

wages, hire or fire, or regulate day-to-day working conditions.

### C. Joint Employer Status Under *Martinez* Prong 2

Under the second test articulated in *Martinez*, an entity can be held liable as an "employer"

if it "suffer[s] or permit[s]" someone to work.  49 Cal. 4th at 64.  The phrase stems from statutes

imposing liability on businesses who knew child labor was occurring, but failed to prevent it,

notwithstanding the absence of a common law employment relationship.  *Id.* at 69.  "[T]he basis of

liability is the defendant's knowledge of and *failure to prevent* the work from occurring."  *Id.* at

70.  For instance, "[a] proprietor who knows that persons are working in his or her business . . .

while being paid less than the minimum wage, clearly suffers or permits that work by failing to

prevent it, *while having the power to do so*."  *Id.* at 69 (emphasis added).  Applying that standard,

*Martinez* found the merchants did not "suffer or permit" the plaintiffs to work even though they

benefitted indirectly from the agricultural workers.  *Id.* at 70.  The court reasoned the merchants

lacked "the power to *prevent* [the] plaintiffs from working," given the farmer "had the exclusive

power to hire and fire his workers, to set their wages and hours, and to tell them when and where

to report to work."  *Id.* (emphasis added).  The court noted "as a practical matter," the merchants

might "have forced [the farmer] to lay off workers or to divert their labor to other projects."  *Id.*

Yet any purchaser of commodities could exert the same pressure, so that "business relationship,

1    standing alone," was insufficient.  *Id.* at 70.

2           Here, as in *Martinez*, Haynes alone possesses "the exclusive power to hire and fire [its]

3    workers, to set their wages and hours, and to tell them when and where to report to work."  *Id.*

4    McDonalds, like the merchants, can exert significant pressure through the franchising relationship,

5    but that feature, standing alone, simply is not enough to support vicarious liability.  Accordingly,

6    McDonalds did not "suffer or permit" plaintiffs to work because it lacked the power to prevent

7    them from working.

8           **D. Joint Employer Status Under *Martinez* Prong 3**

9           According to the third test articulated in *Martinez*, the term "engage" invokes a common

10   law employment relationship.  49 Cal. 4th at 64.  Under the common law, "[t]he principal test of

11   an employment relationship is whether the person to whom service is rendered has the right to

12   control the manner and means of accomplishing the result desired."  *Borello*, 48 Cal. 3d at 350.

13   "What matters is whether the hirer 'retains all *necessary* control' over its operations."  *Ayala v.*

14   *Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014) (quoting *Borello*, 48 Cal. 3d at

15   357).  "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the

16   worker without cause."  *Id.*  Courts also consider "several 'secondary' indicia of the nature of a

17   service relationship."[11]  *Borello*, 48 Cal. 3d at 350.

18          Of course, *Patterson* addressed the common law employment relationship in the

19   franchising context.  It found "[t]he 'means and manner' test generally used by the Courts of

20   Appeal cannot stand for the proposition that a comprehensive operating system alone constitutes

21

22

---

23   [11] These factors include the right to terminate at will, "whether the one performing services is
     engaged in a distinct occupation or business," the "kind of occupation, with reference to whether,
24   in the locality, the work is usually done under the direction of the principal or by a specialist
     without supervision," the skill required in the particular occupation," "whether the principal or the
25   worker supplies the instrumentalities, tools, and the place of work for the person doing the work,"
     the "length of time for which the services are to be performed," "the method of payment, whether
26   by the time or by the job," "whether or not the work is a part of the regular business of the
     principal," and "whether or not the parties believe they are creating the relationship of employer-
27   employee."  *Borello*, 48 Cal. 3d at 350–51.

28

the 'control' needed to support vicarious liability."[12]  *Patterson*, 60 Cal. 4th at 497.  Instead, the franchisor must "retain[] or assume[] a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees."  *Id.* at 478.

Here, as discussed above, Haynes alone controls hiring, firing, wages, hours, and day-to-day aspects of the workplace environment.  Under *Patterson*, moreover, the standards and indirect pressure plaintiffs identify is not enough to support vicarious liability in the franchising context.  *See, e.g.*, 60 Cal. 4th at 485 (noting franchisee "felt he always had to say 'yes'" to franchisor's representative, but ultimately rejecting vicarious liability).  In sum, there is no triable issue under any one of the three prongs described in *Martinez*, and summary judgment must be granted in favor of McDonalds as to that theory of liability.

**E. Joint Employer Status Under "Ostensible Agency" Theory**

There remains, however, a genuine issue of material disputed fact regarding the existence of an ostensible agency relationship.  "Ostensible agency exists where (1) the person dealing with the agent does so with reasonable belief in the agent's authority; (2) that belief is 'generated by some act or neglect of the principal sought to be charged,' and (3) the relying party is not negligent."  *Ochoa*, 133 F. Supp. 3d at 1239 (quoting *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal. App. 4th 741, 747 (1997)).

As a threshold matter, McDonalds invokes *Patterson*, which found "uniform workplace standards" intended to protect the brand do not establish actual agency.  60 Cal. 4th at 497 n.21.  Given McDonalds' uniforms, logos, and food packaging, without more, are insufficient to find "true agency," McDonalds insists they cannot support ostensible agency.  This argument is

---

[12] This was true because "a franchise contract consists of standards, procedures, and requirements that regulate each store for the benefit of *both* parties."  *Patterson*, 60 Cal. 4th at 497 (emphasis added).  The approach "minimizes chain-wide variations that can affect product quality, customer service, trade name, business methods, public reputation, and commercial image."  *Id.*

compelling: "[a]nalysis of the franchise relationship" must heed "contemporary realities," and plaintiffs' theory stands in tension with the trademark protections sanctioned by the court in *Patterson*. 60 Cal. 4th at 478. Not just that, in the franchising context, ostensible agency has been found in interactions generally involving *non-employees* who had isolated or short-term contact with the defendants. *See, e.g.*, *Kaplan*, 59 Cal. App. 4th at 744, 747–48 (individual client sued real estate brokerage companies for fraud and breach of contract after investment fell through); *Kuchta v. Allied Builders Corp.*, 21 Cal. App. 3d 541, 544–45 (1971) (homeowners sued building companies for fraud and breach of contract); *Miller v. McDonald's Corp.*, 150 Or. App. 274 (1997) (consumer sued McDonald's after discovering foreign object in her food); *but see Miller v. D.F. Zee's, Inc.*, 31 F. Supp. 2d 792 (1998) (sexual harassment lawsuit involving Denny's employees). That distinction makes sense—third parties who, unlike plaintiffs, lack an ongoing relationship with a franchisee must rely "on the appearance of agency arguably because they ha[ve] no other knowledge of the actual relationship between the franchisee and the franchisor." *Gray v. McDonald's USA, LLC*, 874 F. Supp. 2d 743, 752 (E.D. Tenn 2012). All of that said, *Patterson* expressly declined to address ostensible agency. 60 Cal. 4th at 494 n.18 ("There is no issue of ostensible agency in the present case."). California courts also permit it even when rejecting actual agency based on the same evidence.[13] *See Kaplan*, 59 Cal. App. 4th at 747–48 (denying summary judgment on ostensible agency based on the "venerable name, Coldwell Banker, the advertising campaign, [and] the logo" among other things). As there is no authority foreclosing a finding of ostensible agency in the present context, plaintiffs will not be precluded as a matter of law from raising the argument here.

Looking at the record, there is considerable evidence, albeit subject to dispute, that McDonalds caused plaintiffs reasonably to believe Haynes was acting as its agent. To begin, plaintiffs uniformly declare they believed both they *and Haynes* worked for McDonalds. Salazar

---

[13] Unlike the standards for true agency, which focus on the exercise of control, the ostensible agency inquiry looks at whether McDonald's, through an act or omission, caused plaintiffs reasonably to believe Haynes was its agent.

Decl. ¶ 2; Zarate Decl. ¶ 2; Lopez Decl. ¶ 2. They also must wear McDonalds uniforms, prepare and serve McDonalds food in McDonalds packaging, and greet customers by saying "Welcome to McDonald's." *See, e.g.*, Salazar Decl. ¶ 2(a). Plaintiffs' managers, who were subject to training by McDonalds and interacted regularly with McDonalds consultants, wore McDonalds' uniforms, and referred to themselves as "working for McDonald's." *See, e.g.*, Salazar Decl. ¶¶ 2(b), (c). Salazar and Lopez applied through a McDonalds website, which said they were seeking "a job opportunity with McDonald's." Salazar Dep. 33:1–34:23; Salazar Decl. ¶ 2(f); Lopez Dep. 31:12–25; Lopez Decl. ¶ 2(g). Zarate's written application likewise was emblazoned with McDonalds' logos. Zarate Dep. 21:3–9 & Ex. 1. As noted above, McDonalds was responsible for some of the content contained in plaintiffs' orientation materials, *see* Haynes Sr. Dep. 146:11–18, and plaintiffs also received documents styled as "McDonald's Store Policies." Lopez Dep. Ex. 12. Although Kimberly Keeton, a Haynes employee, attests she tells interviewees they are applying to work for a franchisee, she did not interview Salazar, Lopez, or Zarate. Salazar Decl. ¶ 5; Zarate Dep. 21:3–24:9; Lopez Decl. ¶ 4. Plaintiffs contend nobody ever told them McDonalds was *not* their employer, Lopez Decl. ¶ 5; Zarate Decl. ¶ 2(g); Salazar Decl. ¶ 6, and plaintiffs themselves had direct interaction with McDonalds' business consultants, *see, e.g.*, Salazar Dep. 111:2–16; Zarate Dep. 150:8–151:12. As to reliance, plaintiffs submit they sought employment at McDonalds because it "is a large corporation with many stores around the world," "would involve a steady job in a safe environment," and "would make sure [they were] paid and treated correctly, because it is a large corporation with standardized systems." *See, e.g.*, Salazar Decl. ¶ 3.

On the other hand, the evidence McDonalds invokes establishes a genuine dispute over the reasonableness of plaintiffs' beliefs that Haynes was acting as McDonalds' agent. For instance, McDonalds notes the online employment applications *also* state plaintiffs "were applying for employment with an independently owned and operated McDonald's franchisee, a separate company and employer from McDonald's Corporation and any of its subsidiaries." Lopez Dep. Exs. 1, 2; Salazar Dep. Exs. 1, 2. Importantly, similar disclosures, while persuasive, have not been found automatically to defeat the reasonableness of an individual's beliefs. *See, e.g.*, *Kaplan*, 59

1    Cal. App. 4th at 744 (noting presence of disclaimer); *Miller v. McDonald's Corp.*, 150 Or. App.

2    274, 284 (1997) (concluding there was a disputed issue over whether one disclosure was sufficient

3    to defeat the impression of control cultivated by the franchisor).

4           Though it is a close call, particularly as plaintiffs are long-term employees, viewing the

5    evidence in the light most favorable to plaintiffs, a jury could reasonably find McDonalds to be a

6    joint employer by virtue of an ostensible agency relationship.  The motion for summary judgment

7    must accordingly be denied as to that theory underlying the alleged Labor Code violations.[14]

8           **F. Negligence**

9           To sustain the negligence claim, plaintiffs must show McDonalds owed them a duty of

10   care, the duty was breached, McDonalds' conduct caused the breach, and they suffered damages.

11   *See McIntyre v. Colonies-Pac., LLC*, 228 Cal. App. 4th 664, 671 (2014).  Plaintiffs aver

12   McDonalds' duty arises from its position as a direct beneficiary of their services.  Compl. ¶ 212.

13   They further insist McDonalds did not exercise due care in its contracting and supervision of the

14   Haynes Partnership.  *Id.* ¶ 212.  Specifically, they assert McDonalds knew or should have known

15   Haynes was violating their "employment law rights" because "McDonald's closely monitored,

16   supervised, and controlled Haynes Partnership restaurant operations, including the hours worked

17   by Plaintiffs . . . the breaks received by those crew members, the amounts paid to those crew

18   members, and the conditions under which those crew members labored."  Compl. ¶ 137.  As a

19   result of this conduct, plaintiffs maintain they suffered lost wages.  *Id.* ¶ 215.

20          Summary judgment will be granted in favor of McDonalds on the negligence claim, as

21   required by California's new right-exclusive remedy doctrine.  "As a general rule, where a statute

22   creates a right that did not exist at common law and provides a comprehensive and detailed

23   remedial scheme for its enforcement, the statutory remedy is exclusive."  *Rojo v. Kliger*, 52 Cal.

---

[14] Conspiracy and aiding and abetting theories of liability appear in the complaint and are
addressed in McDonalds' opening brief, but plaintiffs do not press those theories in opposition,
and they are not factually supported.  Accordingly, summary judgment will be entered in favor of
McDonalds on those theories of liability.

3d 65, 79 (1990).  The California Court of Appeal has found the Labor Code statutes regulating

minimum wages, rest breaks, meal breaks, and pay stubs "created new rights and obligations not

previously existing in the common law" and "provide[] a comprehensive and detailed remedial

scheme for [their] enforcement."  *Brewer v. Premier Golf Properties*, 168 Cal. App. 4th 1243,

1253–54 (2008).  As plaintiffs' negligence claim asserts the same factual basis underlying its

Labor Code claims, they may not deploy the common law to "duplicate the theories of liability

[they] assert under the California Labor Code."[15]  *Ochoa*, 133 F. Supp. 3d at 1241.  *See also*

*Santiago v. Amdocs, Inc.*, No. C 10–4317 SI, 2011 WL 1303395, at *3–4 (N.D. Cal. Apr. 2, 2011)

(declining to permit common law conversion claim based on statutory wage and hour violations);

*Helm v. Alderwoods Grp., Inc.*, 696 F. Supp. 2d 1057, 1077–78 (2009) (concluding "common law

claims premised on [Labor Code violations] are therefore preempted").

## V. CONCLUSION

Viewing the undisputed evidence in the light most favorable to plaintiffs, McDonalds did

not retain or exert direct or indirect control over plaintiffs' hiring, firing, wages, hours, or material

working conditions.  Nor did McDonalds suffer or permit plaintiffs to work, engage in an actual

agency relationship, participate in a conspiracy, or aid and abet the alleged wage and hour

violations.  Accordingly, summary judgment for defendants will be entered on those theories.  The

motion for summary judgment also will be granted as to plaintiffs' negligence claim.  The motion

must be denied in part, however, because plaintiffs' Labor Code claims may proceed under an

ostensible agency theory.

The only disputed sealing issue is exhibit 30 to the deposition of Jennie Watt.  *See* Dkt.

No. 155, Ex. P-30.  McDonalds demonstrates adequately that the document describes in detail its

---

[15] Plaintiffs invoke *Carillo v. Schneider Logistics, Inc.*, No. CV 11-8557 CAS (DTBx) (C.D. Cal. May 13, 2013), which denied a motion to dismiss a negligence claim against Walmart based on allegations that Walmart failed to exercise due care in hiring and supervising a subcontractor who employed the plaintiffs.  Plaintiffs' negligence claim, however, fundamentally is premised on McDonalds' monitoring, supervision, and control of their working conditions, and thus is an attempt to "hold [McDonalds] liable in negligence due to [McDonalds'] violations of the California employment statutes."  *Carillo*, No. CV 11-8557 CAS (DTBx) at 11.

internal franchising strategy, and that disclosure may subject it to competitive harm.  Exhibit 30 therefore appropriately may be filed under seal.  The remaining requests will be dealt with in a separate order.

**IT IS SO ORDERED**.


Dated: August 16, 2016

_____
RICHARD SEEBORG
United States District Judge