MICHAEL RUBIN (SBN 80618)
BARBARA J. CHISHOLM (SBN 224656)
P. CASEY PITTS (SBN 262463)
MATTHEW J. MURRAY (SBN 271461)
RAPHAEL N. RAJENDRA (SBN 255096)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:   (415) 421-7151
Facsimile:   (415) 362-8064
E-mail: mrubin@altber.com
        bchisholm@altber.com
        cpitts@altber.com
        mmurray@altber.com
        rrajendra@altber.com

JOSEPH M. SELLERS (*pro hac vice*)
MIRIAM R. NEMETH (*pro hac vice*)
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699
E-mail: jsellers@cohenmilstein.com
        mnemeth@cohenmilstein.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – San Francisco

| | |
|---|---|
| GUADALUPE SALAZAR, *et al.*, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MCDONALD'S CORP., *et al.*,<br><br>Defendants. | CASE NO. 3:14-cv-02096-RS<br><br>**SUPPLEMENTAL DECLARATION OF DAVID M. BRESHEARS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:         December 8, 2016<br>Time:         1:30 P.M.<br>Courtroom:    3<br>Judge:        Hon. Richard Seeborg<br><br>Complaint Filed:    March 12, 2014 |

I, David M. Breshears, hereby declare:

1. The facts set forth herein are personally known to me, and I have firsthand knowledge of the same. If called as a witness, I could and would competently testify thereto.

2. I am a Certified Public Accountant, licensed in the State of California, and Certified in Financial Forensics. I am currently a partner at Hemming Morse, LLP, CPAs, Forensic and Financial Consultants. My work in the accounting profession includes experience as an auditor and as a consultant. My expert qualifications, including my testimony, are described in my declaration, dated September 30, 2016, that was submitted in support of Plaintiffs' Motion for Class Certification (my "Initial Declaration").

3. I have consulted on and/or testified in over 200 matters involving wage-and-hour-related disputes, including those arising under the FLSA and the California Labor Code. These matters have involved allegations of unpaid overtime, off-the-clock work, meal and rest break violations, employment misclassification, time shaving, record keeping violations, and unreimbursed business expenses.

4. My firm has been compensated for my review and analysis in this matter at my standard hourly rate of $440 per hour. Others have assisted me in my work, under my supervision and at my direction, and my firm has been compensated for their work at their standard hourly rates. My firm's compensation on this assignment is not on contingency and does not depend on whether Plaintiffs prevail in this action.

5. I have been retained by counsel for the named Plaintiffs and others similarly situated in the matter of *Guadalupe Salazar, et al. v. McDonald's Corp., et al.* I have been asked to respond to McDonald's assertions in its opposition to Plaintiffs' Motion for Class Certification that managers do not correct mistakes in crew members' time punch entries in certain circumstances, as well as to review and respond to certain assertions in the declaration of Defendants' expert, Dr. David Lamoreaux, Ph.D., dated October 28, 2016.

**Analysis of Time Punch Edits**

6. Plaintiffs' counsel has informed me that McDonald's asserts in its class certification opposition that managers only "looked for" (and presumably only edited) time punches when the

original time punches were "unbalanced" on a given employee shift date.[1]  I have been asked by Plaintiffs' counsel to review and analyze the Time Punch Change Approval Reports with respect to time punch edits.  The Time Punch Change Approval Report (which each appear to reflect time punches for a particular store on a particular day) contains the following information: (1) employee ID, (2) employee name, (3) job title code, (4) "Original from Clock" shift/clock ins and outs, (5) "Original from Clock" paid break outs and ins (which fall within the shift/clock ins and outs), (6) "Original from Clock" hours, (7) "History/Current" shift/clock ins and outs, (8) "History/Current" paid break outs and ins, and (9) "History/Current" hours.

       7.     I described the time punch records that I have analyzed in footnote 2 to my Initial Declaration.  The Time Punch Change Approval Reports that I have analyzed include information for 305,300 employee shift dates.  My analysis of the Time Punch Change Approval Reports currently includes 236,554 employee shift dates attributable to employees in the class.  I described the job positions excluded from my analysis in paragraph 6 of my Initial Declaration.[2]

<u>All Time Punch Edits</u>

       8.     Of the 236,554 employee shift dates attributable to employees in the class, 28,890 (or 12.2%) show that edits were made to the employee's time punches for that shift date.  For purposes of this report, I identified an employee shift date as having been edited when (1) the

---

[1] Plaintiffs' counsel has informed me that McDonald's asserts in its class certification opposition that "unbalanced" means "where a crew member clocks 'in' and does not have a corresponding clock 'out.'"  For purposes of this report, I use the term "balanced" to refer to instances when the Time Punch Change Approval Report shows that there are an equal number of clock ins and clock outs (i.e., an even number of time punches) in the original punches on a given employee shift date, which would allow for the calculation of related hours.  I use the term "unbalanced" to refer to instances when there are an odd number of time punches in the original punches on a given employee shift date, and thus no total hours for the original punches.

[2] These totals are lower than the number of shifts and payroll dates listed in paragraph 12 of my Initial Declaration, because for my Initial Declaration I analyzed both Time Punch Summary Reports and Time Punch Change Approval Reports, as described in paragraphs 7 to 15 of my Initial Declaration.  My analysis in this declaration relies on only readily available Time Punch Change Approval Reports, because they show edits to the original time punches while the Time Punch Summary Reports do not show such edits.

1  "Original from Clock" hours and the "History/Current" hours are not equal or (2) the "Original
2  from Clock" paid break hours and the "History/Current" paid break hours are not equal.[3]

3      9.    Edits were made to employees' original time punches at all eight restaurants. The following chart shows for each of the eight restaurants (1) the number of employee shift dates on which edits were made to the employee's time punches, (2) the total number of employee shift dates in the analyzed records, and (3) the percentage of all analyzed employee shift dates on which edits were made to the employee's time records:

| Store | EE Shift Dates with Edits | All EE Shift Dates | % |
|---|---|---|---|
| 1666 | 6,291 | 47,487 | 13.2% |
| 6593 | 2,313 | 29,023 | 8.0% |
| 7100 | 4,568 | 34,456 | 13.3% |
| 7847 | 2,434 | 17,029 | 14.3% |
| 10235 | 4,097 | 30,701 | 13.3% |
| 11834 | 2,193 | 28,747 | 7.6% |
| 23467 | 6,027 | 37,268 | 16.2% |
| 30911 | 967 | 11,843 | 8.2% |
| Total | 28,890 | 236,554 | 12.2% |

*Time Punch Edits When the Original Punches Were Already "Balanced"*

    10.    Of the 28,890 employee shift dates with edits to employees' time punches, I have determined that 9,050 (or 31.3%) already had a "balanced" number of "Original from Clock" shift/clock ins and outs and paid break outs and ins before edits were made.

    11.    Edits were made when employees' original time punches were "balanced" at all eight restaurants. The following chart shows for each of the eight restaurants (1) the number of employee shift dates on which edits were made when the employee's original time punches were already "balanced," (2) the total number of employee shift dates in which any edits were made, and

---

[3] This definition is conservative because it would not capture instances in which an employee's time punches were edited but the edits did not change either the employee's total hours or the employee's total paid break hours.

3
Supplemental Declaration of David M. Breshears in Support of Plaintiffs' Motion for Class Certification
Case No. 3:14-cv-02096-RS

(3) the percentage of all employee shift dates with edits on which the employee's original time records were "balanced:

| Store | "Balanced" EE Shift Dates with Edits | All EE Shift Dates with Edits | % |
|---|---|---|---|
| 1666 | 2,008 | 6,291 | 31.9% |
| 6593 | 526 | 2,313 | 22.7% |
| 7100 | 1,153 | 4,568 | 25.2% |
| 7847 | 953 | 2,434 | 39.2% |
| 10235 | 1,317 | 4,097 | 32.1% |
| 11834 | 592 | 2,193 | 27.0% |
| 23467 | 2,170 | 6,027 | 36.0% |
| 30911 | 331 | 967 | 34.2% |
| Total | 9,050 | 28,890 | 31.3% |

*Added Records of Paid Rest Breaks When the Original Punches Were Already "Balanced"*

12. Of the 9,050 employee shift dates on which edits were made to original time punches that were already "balanced," I have been asked by Plaintiffs' counsel to determine the number of employee shift dates where the edits added a paid rest break that was not reflected in the "Original from Clock" paid break outs and ins. To determine when edits added a paid rest break, I identified those employee shift dates where the related "History/Current" paid break hours are greater than the related "Original from Clock" paid break hours by at least 0.166 hours (or approximately 10 minutes).[4] I have identified that 2,812 employee shift dates (or 31.1% of all dates on which edits were made to already "balanced" original time punches) reflect edits that added at least one paid rest break.[5]

13. Edits adding paid rest breaks when employees' original time punches were already "balanced" were made at all eight restaurants. The following chart shows for each of the eight restaurants (1) the number of employee shift dates on which a rest break was added when the

---

[4] This method is conservative because it would not count any instance in which edits added a paid rest break of some duration less than 0.166 hours.

[5] This method does not count edits that added paid rest breaks to shifts when the original time punches were not "balanced."

employee's original time punches were already "balanced," (2) the total number of employee shift dates on which any edits were made when the employee's original time punches were already "balanced,", and (3) the percentage of all edits to "balanced" original punches that involved the addition of a paid rest break:

| Store | "Balanced" EE Shifts Dates with Added Paid Rest Break | "Balanced" EE Shift Dates with Any Edits | % |
|---|---|---|---|
| 1666 | 539 | 2,008 | 26.8% |
| 6593 | 217 | 526 | 41.3% |
| 7100 | 410 | 1,153 | 35.6% |
| 7847 | 184 | 953 | 19.3% |
| 10235 | 458 | 1,317 | 34.8% |
| 11834 | 111 | 592 | 18.8% |
| 23467 | 712 | 2,170 | 32.8% |
| 30911 | 181 | 331 | 54.7% |
| Total | 2,812 | 9,050 | 31.1% |

*Added Records of Unpaid Meal Periods When the Original Punches Were Already "Balanced"*

14. Of the 9,050 employee shift dates on which edits were made to original time punches that were already "balanced," I have also been asked by Plaintiffs' counsel to determine the number of employee shift dates where edits added an unpaid meal period that was not reflected in the "Original from Clock" shift/clock ins and outs. To determine when edits added an unpaid meal period, I identified those employee shift dates where the related "History/Current" shift/clock hours are less than the related "Original from Clock" shift/clock hours by 25 to 35 minutes.[6] I have identified that 479 employee shift dates (or 5.3% of all dates on which edits were made to already "balanced" original time punches) reflect edits that added one unpaid meal period.

15. Edits adding unpaid meal periods when employees' original time punches were already "balanced" were made at all eight restaurants. The following chart shows for each of the eight restaurants (1) the number of employee shift dates on which an unpaid meal period was added

---
[6] This method may be conservative because it would not count any instance in which all edits to an employee shift date, taken together, reduced "Original from Clock" shift/clock hours to "History/Current" shift/clock hours by less than 25 minutes or more than 35 minutes.

when the employee's original time punches were already "balanced," (2) the total number of employee shift dates on which any edits were made when the employee's original time punches were already "balanced,", and (3) the percentage of all edits to "balanced" original punches that involved the additional of an unpaid meal period:

| Store | "Balanced" EE Shift Dates with Added Unpaid Meal Period | "Balanced" EE Shift Dates with Any Edits | % |
|---|---:|---:|---:|
| 1666 | 95 | 2,008 | 4.7% |
| 6593 | 18 | 526 | 3.4% |
| 7100 | 61 | 1,153 | 5.3% |
| 7847 | 61 | 953 | 6.4% |
| 10235 | 60 | 1,317 | 4.6% |
| 11834 | 44 | 592 | 7.4% |
| 23467 | 101 | 2,170 | 4.7% |
| 30911 | 39 | 331 | 11.8% |
| Total | 479 | 9,050 | 5.3% |

### Responses to Certain Assertions in Dr. Lamoreaux's Report

*Unpaid Overtime Hours as a Result of the Non-24-Hour Work Day*

16.  In his declaration, Dr. Lamoreaux states that, with respect to unpaid overtime hours as a result of a non-24-hour work day, he was asked by Defendants' counsel to analyze crew members' time punch and payroll records using a 4:00 am to 4:00 am workday to calculate overtime due rather than a midnight-to-midnight calendar workday.[7]

17.  My analysis of the data for those employees who are within the class shows that, if their regular, overtime, and double-time hours had been calculated on a 4:00 am to 4:00 am workday basis instead of using defendants' method (which does not use any 24-hour workday but rather assigns punches to the date on which the shift began), (1) an additional 0.3% of regular hours would be overtime or double-time hours and (2) 16.1% (i.e., 193) of the 1,202 employees would experience at least one workweek where regular hours would have been recognized and

---

[7] Declaration of Dr. David Lamoreaux, Ph.D., dated October 28, 2016, p. 4 - 5

compensated as overtime or double-time hours.[8]  Based on my analysis, defendants' actual practice resulted in counting fewer employee hours as overtime or double time than would have been counted had defendants used a 4:00 am to 4:00 am workday at all but one of the stores (store 7847).  Contrary to Dr. Lamoreaux's assertion that crew members at one store would be "better off" under defendants' practice than under a 24-hour workday that began at 4:00 am,[9] using a 4:00 am to 4:00 am workday at store 7847 instead of defendants' actual practice would not have materially changed the number of hours treated as overtime or double time.

18. Further, comparing the methodology defendants actually used to calculate overtime with the 4:00 am to 4:00 am workday method demonstrates that far more workweeks would have included overtime under the 4:00 am to 4:00 am workday method than under defendants' method.  Based on the 58,828 workweeks in the data for those employees who are within the class, 2,303 of those weeks include hours that defendants considered regular hours but that would have been considered overtime or double-time hours if defendants had used a 4:00 am to 4:00 am workday in calculating overtime.  In contrast, only 196 workweeks included hours that defendants considered overtime or double-time hours but that would have been considered regular hours using a 4:00 am to 4:00 am workday method.

*Dr. Lamoreaux's Comparison of the Rest Breaks Records for Two Particular Employees*

19. With respect to the recording of rest breaks, Dr. Lamoreaux states that "a review of some individuals in the data shows that there is also variation within shifts at the same location."[10] He offers as his only example two employees who worked late afternoon shifts at store 23467 from January through August 2013 – Jesus Lop, who Dr. Lamoreaux asserts recorded first and second rest periods on over 85% of his shifts, and Darius Max, who Dr. Lamoreaux asserts recorded first and second rest periods on approximately 35% of his shifts.[11]  However, my analysis of the Time

---

[8] To determine whether overtime hours would increase for a given employee workweek, I have combined all days within that workweek, including those days that showed an increase in overtime hours and those days that showed a decrease in overtime hours.

[9] Declaration of Dr. David Lamoreaux, Ph.D., dated October 28, 2016, p. 5

[10] Declaration of Dr. David Lamoreaux, Ph.D., dated October 28, 2016, p. 12.

[11] Declaration of Dr. David Lamoreaux, Ph.D., dated October 28, 2016, p. 12 - 13.

1  Punch Change Approval Reports reflects that while Darius Max was a crew member during this
2  time period, Jesus Lop was a certified swing manager during the entire time period that Dr.
3  Lamoreaux analyzed, and as such, was not within the class and was excluded from my analysis
4  during this time period.[12]

6  I declare under penalty of perjury under the law of the State of California that the foregoing
7  is true and correct. Executed this 18th day of November, 2016 in Walnut Creek, California.

*Dave Breshears*

David M. Breshears, CPA/CFF

---

[12] Paragraphs 6 and 8 of my Initial Declaration explained that the Time Punch Change Approval Reports show a job code for each employee for each shift day. The Time Punch Change Approval Reports for January through August 2013 reflect that Jesus Lop had the job title of "Cert. Swing Mgr."

8
Supplemental Declaration of David M. Breshears in Support of Plaintiffs' Motion for Class Certification
Case No. 3:14-cv-02096-RS